# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 11, 2014 Session

## STATE OF TENNESSEE v. KARL P. COOPER

**Direct Appeal from the Circuit Court for Williamson County**
**No. II-CR036314     James G. Martin, III, Judge**

---

### No. M2013-01084-CCA-R3-CD - Filed December 17, 2014

---

A Williamson County Circuit Court Jury convicted the appellant, Karl P. Cooper, of driving under the influence (DUI), second offense; speeding; and violating the open container law. The appellant received a total effective sentence of eleven months and twenty-nine days and was ordered to spend sixty days of the sentence in jail before being released on probation. On appeal, the appellant contends that the trial court erred by allowing the State to violate the rule of witness sequestration, that the trial court erred by sustaining the State's objection to the appellant's request to have the arresting officer demonstrate a field sobriety test, and that the evidence was insufficient to sustain his DUI conviction. The State concedes that the trial court erred by allowing the violation of the rule of sequestration but contends the error was harmless. Upon review, we conclude that the violation of the rule of sequestration was reversible error; accordingly, the judgment of the trial court is reversed, and the case is remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. JERRY L. SMITH, J., not participating.

Steven M. Garner, Franklin, Tennessee, for the appellant, Karl P. Cooper.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Kim R. Helper, District Attorney General; and Carlin C. Hess, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

About 1:30 a.m. on November 5, 2011, Sergeant Rick Clouse of the Franklin Police Department was on patrol near the intersection of McEwen Drive and Carothers. Sergeant Clouse, who was the supervisor of the midnight shift, testified at trial that he saw a white pickup truck traveling south on Carothers. The truck, driven by the appellant, proceeded at a high rate of speed through a flashing red light at the intersection. Sergeant Clouse immediately began following the truck. At the top of a hill, Sergeant Clouse saw Officer Ben Jones "running stationary radar on Carothers." Officer Jones radioed Sergeant Clouse to inform him that the appellant was driving fifty-five miles per hour in a forty-mile-per-hour zone. Sergeant Clouse responded that he intended to stop the appellant for running the red light. Officer Jones followed Sergeant Clouse to assist with the stop.

Sergeant Clouse said that they proceeded south on Carothers toward Liberty Pike. As they approached the intersection, Sergeant Clouse activated his car's blue lights. Upon reaching the intersection, the appellant made a right turn onto Liberty Pike. After making the turn, Sergeant Clouse activated his car's siren. Approximately forty-five seconds after Sergeant Clouse activated the blue lights, the appellant stopped his vehicle at a curb.

Sergeant Clouse stated that he and Officer Jones parked behind the appellant. Sergeant Clouse got out of his vehicle and approached the driver's side of the truck, and Officer Jones approached the passenger side. When Sergeant Clouse made contact with the appellant, he immediately smelled alcohol and saw a bottle of Bud Light beer in the console next to the appellant. The appellant's eyes were watery and bloodshot. Sergeant Clouse asked the appellant if he had been drinking. The appellant responded that he had consumed two beers. Sergeant Clouse informed the appellant that he had been stopped for speeding and running a red light and asked the appellant to step out of the vehicle so that Sergeant Clouse could ascertain whether the appellant was fit to drive. When the appellant complied, Sergeant Clouse confirmed that the smell of alcohol was coming from the appellant. He also noticed that the appellant had "a fresh dip of snuff" in his lip.

Sergeant Clouse said that he asked the appellant to perform field sobriety tests, and the appellant agreed. The first test, the "walk and turn," had been standardized by the National Highway Transportation Safety Administration (NHTSA) and the Tennessee Governor's Board of Highway Safety. Sergeant Clouse explained:

> Usually we try to use either the fog line or either a line on the
> street. They are basically straight and they are easy to identify
> and they are thick. They are not something really skinny.

> Usually what I do is I have the person stand on the line. Usually with his right foot in front of his left or his left foot in front of his right touching heel to toe with their arms down . . . . They stand heel to toe on the line with their arms down to their side. They are required to remain in that position until I get finished explaining the tasks and demonstrating that for them.

Sergeant Clouse said that while he was instructing the appellant on how to perform the test, the appellant lost his balance. The appellant "played it off a little bit" by stepping off the line and walking around in a small circle. Sergeant Clouse stepped off the witness stand and demonstrated how the appellant lost his balance and walked in a circle.

Sergeant Clouse said that thereafter, the appellant refused to perform any field sobriety tests. Sergeant Clouse asked the appellant if he wanted to perform a different task, and the appellant repeated that he did not want to perform any field sobriety tests. Sergeant Clouse informed the appellant that if he did not take the tests, he would be arrested. After being handcuffed, the appellant agreed to take the tests.

Sergeant Clouse said that he uncuffed the appellant and demonstrated the test. The appellant did not ask any questions and could not "maintain the start position. He was swaying." During the test, the appellant began "flaring," which Sergeant Clouse said was raising his arms slightly to the side instead of keeping his hands straight down at his sides. Sergeant Clouse demonstrated "flaring" for the jury. Sergeant Clouse said that the appellant also stepped off the line and "cant[ed]" his feet. Sergeant Clouse explained that the appellant's heels were on the line but that his feet were not. Sergeant Clouse demonstrated "canting," which he described as walking as if "you've got Bozo feet."

Sergeant Clouse said that the appellant exhibited five of the eight clues of impairment established by the NHTSA: (1) he could not maintain the proper start position, (2) he used his arms for balance, (3) he stepped off the line, (4) he did not always step heel to toe, and (5) he did not perform the turn as Sergeant Clouse had demonstrated. He asserted, "[I]f you've got two clues out of the eight, that normally says that a person could possibly be impaired and that that person [is] considered to be over the per se legal limit of .08."

Sergeant Clouse said that the second test was the "one leg stand," which was also an NHTSA standardized test. First, Sergeant Clouse ascertained that the appellant had no health problems that would prevent him from performing the test. Next, Sergeant Clouse explained and demonstrated that the appellant was to stand on one leg while raising the other leg six inches, pointing the toes of the raised foot, keeping his hands at his sides, and counting as instructed.

Sergeant Clouse said that the appellant attempted to perform the test. He exhibited all four clues of impairment by swaying, losing his balance, "flaring" his arms, and setting his foot down. Sergeant Clouse said that four clues of impairment were associated with the test and that exhibiting two clues indicated "that the person could be impaired."

Sergeant Clouse said that the third test was the "Romberg Task," which required the appellant to stand with both feet together,[1] arms down at his sides, head tilted back, and eyes closed. The appellant was supposed to open his eyes when thirty seconds had elapsed. Sergeant Clouse explained:

> Usually if a person is slower than 30 seconds it usually shows that you're under the influence of a depressant such as alcohol. If you're faster, say 15 seconds, when you're supposed to be estimating 30, that usually indicates that you're under the influence of a stimul[ant] such as . . . meth[amphetamine] or crack cocaine.

Sergeant Clouse said that when the appellant opened his eyes, thirty-six seconds, not thirty, had elapsed. Additionally, the appellant had "pronounced swaying" during the test and "had to be instructed twice to put his feet together." The prosecutor asked Sergeant Clouse, "How was 36 seconds is that good, is that bad?" Sergeant Clouse responded, "It's not 30 seconds."

Sergeant Clouse said that near the end of the traffic stop, the appellant asserted that he had consumed only two beers and that he was not "drunk." Sergeant Clouse told the appellant that he could arrange for the appellant to take a personal or portable breath test (PBT). The appellant refused to take the PBT.

Sergeant Clouse stated that at least five times, the appellant asserted that he had consumed only two beers. Sergeant Clouse asserted, "[I]t's been my experience that pretty much after two beers that's the last thing that a person remembered consciously drinking. If they're not a raging alcoholic."

After the appellant refused the breath test, Sergeant Clouse arrested him for driving under the influence. He based his arrest upon "the totality of the circumstances, the smell of alcohol, the beer in the console, he admitted to drinking, his driving behavio[r], and the fact that he didn't do very well on the FSTs." After the arrest, Sergeant Clouse searched the appellant's vehicle. He touched the bottle of Bud Light that was in the console and

---

[1]Sergeant Clouse demonstrated how the appellant was supposed to stand during the test.

-4-

determined that it was cold and had condensation on it. A twelve-pack of cold Bud Light was located behind the passenger seat and had only seven cans remaining. Sergeant Clouse asked the appellant about the pack, and the appellant said, "'Oh, okay, yeah, okay, whatever, all right. I had three beers instead of two, okay, I lied.'"

Sergeant Clouse stated that he did not have video recording equipment in his patrol car. However, Officer Jones was driving a newer patrol car that was equipped with a video camera that recorded the appellant's performance on the field sobriety tests. The State showed the video to the jury.

On cross-examination, Sergeant Clouse said that Carothers was a four-lane divided highway and that when he first saw the appellant, the appellant was driving south. Sergeant Clouse was "pretty sure" the light was red when the appellant drove through the intersection without stopping. Sergeant Clouse did not see the appellant weave or swerve while he was driving. Additionally, Sergeant Clouse noticed that the bottle of beer in the console was not empty.

Sergeant Clouse clarified that he was trained in the NHTSA-approved standards for field sobriety tests and that he had in-service training on field sobriety tests every year.

Sergeant Clouse said that while he was giving the instructions for the walk and turn test, the appellant stepped off the line twice. Sergeant Clouse acknowledged that the video did not show that the appellant swayed during the test. Sergeant Clouse considered the appellant's stepping off the line twice to be an indicator of his intoxication. He explained that when the appellant stepped off of the line, he refused to take other tests. He said that the appellant did not step off the starting position the second time he performed the test.

Sergeant Clouse said that during the test, the appellant was not allowed to move his hands. He acknowledged, however, that the NHTSA instruction manual stated that the clue for intoxication was that the "[s]uspect raises one or both arms more than six inches from the side in order to maintain balance." Sergeant Clouse said that the appellant's walking "pigeon-toed" was an indicator of intoxication. He acknowledged that the NHTSA instruction manual stated that the clue for intoxication was when the "suspect steps so that one foot is entirely off the line." He agreed that if part of the appellant's foot remained on the line, the NHTSA might consider it "okay"; nevertheless, he considered "canting" to be a clue of intoxication.

Regarding the one leg stand, Sergeant Clouse acknowledged that he instructed the appellant that he could put his foot down if necessary. Sergeant Clouse said that "[p]utting your foot down is maintaining balance. The fact that he wasn't looking at his foot is failure

to follow the instructions." Sergeant Clouse said putting a foot down was "not the end of the world. He just needs to pick it back up and continue to count." Sergeant Clouse agreed that on direct examination, he "may have" testified that the appellant failed all four clues of the test. He further acknowledged that the appellant did not stop the test prematurely, which was one of the four clues of intoxication.

Sergeant Clouse said that during the Romberg test, the appellant was supposed to close his eyes, count thirty seconds, and then open his eyes. The appellant opened his eyes at thirty-six seconds. After Sergeant Clouse's response, the following colloquy occurred:

> [Defense Counsel:] And is that a lot to be – that's missing it by six seconds. But is that a lot? Does that indicate he's intoxicated?
>
> [Sergeant Clouse:] It's not 30 seconds.
>
> [Defense Counsel:] So what if somebody did it in 28 second[s]?
>
> [Sergeant Clouse:] Then it would not be 30 seconds.

Sergeant Clouse also acknowledged that the appellant's speech was not slurred and that he was not belligerent.

Patrol Officer Ben Jones testified that at approximately 1:30 a.m. on November 5, 2011, he was parked in a turnaround median on Carothers Parkway north of Liberty Pike, running stationary radar, when he saw a white pickup truck drive over the hill at a rate of fifty-five miles per hour in a forty-mile-per-hour zone. Sergeant Clouse was behind the truck. Officer Jones radioed Sergeant Clouse to inform him that the appellant was speeding. Sergeant Clouse responded that he intended to stop the appellant's vehicle. Officer Jones began following Sergeant Clouse to assist with the stop.

Officer Jones said that when Sergeant Clouse activated the blue lights on his patrol car, the appellant began driving more slowly and eventually parked his truck. The officers parked behind the appellant. Sergeant Clouse approached the driver's side, and Officer Jones approached the passenger's side. Officer Jones looked through the passenger window and saw a Bud Light beer bottle in the center console; the bottle was not empty. Officer Jones smelled alcohol on the appellant when he got out of the truck. He also observed that the appellant's eyes were bloodshot and watery.

Officer Jones said that he watched as Sergeant Clouse administered the field sobriety tests. The appellant performed poorly on the walk and turn test by stepping off the line and failing to maintain his balance. Afterward, the appellant said he did not want to perform any more tests. The officers arrested the appellant, who then asserted that he was willing to perform additional field sobriety tests. Officer Jones said, "The second attempt for the walk and turn task [was] similar to what Sergeant Clouse described. He just missed heel to toe, improper turn." The State asked, "Did it appear to you that he was canting his feet out as Officer Clouse described?" Officer Jones responded, "Yes, sir."

The prosecutor then said, "Now, I'm going to skip ahead a little bit because Officer Clouse testified to the majority of the FSTs." Officer Jones said that after the arrest, he asked the appellant to take a breath test or have his blood drawn and tested. Officer Jones then read the implied consent form advising the appellant of the consequences of violating the implied consent law. When he finished, the appellant asked him to "just kind of plain [E]nglish to read it to him." Officer Jones summarized the tenets of the implied consent law, and the appellant again refused to take either test. Thereafter, Officer Jones transported the appellant to the justice center. During the drive, the appellant was "very chatty." Officer Jones opined that the appellant was under the influence of alcohol and that he was unfit to drive.

On cross-examination, Officer Jones said that he had been trained on the NHTSA tests. He said that the video showed that as he was transporting the appellant to the justice center, the appellant asked if he could still take a blood or breath test. Officer Jones surmised that he did not respond to the appellant's question because he "might not have heard him." Officer Jones explained that a microphone was located in the backseat, so the appellant's voice was clear on the recording; however, Officer Jones could not "hear everything over the radio and that cage, necessarily, every time."

Officer Jones said that during the appellant's first attempt to perform the walk and turn test, he lost his balance and could not "maintain the start position"; therefore, the test was stopped. During the second attempt, the appellant missed touching heel to toe, turned improperly, and stopped before the task was complete. Defense counsel said, "I thought that's what [Sergeant] Clouse said, but I didn't – I don't think I got that from his the last – the second time I asked him that." Officer Jones clarified that the appellant's mistake was that during the test, he asked a question before he finished.

Officer Jones said that he was familiar with the NHTSA standards for the walk and turn test and confirmed that the appellant was permitted to raise his arms six inches from his sides.

Officer Jones acknowledged that his report stated that the appellant took thirty-six

seconds to complete the Romberg test. After extensive cross-examination, he further acknowledged that he timed the appellant during the test and that, on the video, he stated that the appellant was "[d]ead on it." He explained that, generally, he allowed about ten seconds either way because he believed that a few seconds' variation was understandable. After watching the video, Officer Jones said that the appellant took thirty-six seconds to perform the test, noting that he "was given instructions at the beginning at 32 after. He stopped the task[,] asked a question and began at 38 after." Officer Jones acknowledged, however, that he began timing when Sergeant Clouse first gave instructions to the appellant and that Sergeant Clouse actually instructed the appellant twice. Officer Jones further acknowledged that from the time of the second instruction, the appellant performed the test in thirty seconds.

After the conclusion of the proof, the jury found the appellant guilty of driving under the influence (DUI), second offense; speeding; and violating the open container law. The appellant agreed to a total effective sentence of eleven months and twenty-nine days, suspended after service of sixty days. On appeal, the appellant contends that the trial court erred by allowing the State to violate the rule of witness sequestration, that the trial court erred by sustaining the State's objection to the appellant's request to have Sergeant Clouse demonstrate the Romberg test, and that the evidence was insufficient to sustain his convictions.

## II. Analysis

### A. Witness Sequestration

The appellant contends that the trial court erred by allowing Officer Jones, the prosecuting officer, to testify as the State's second witness in violation of Tennessee Rule of Evidence 615. The State acknowledges that Officer Jones should have testified first. However, the State argues that the appellant has failed to show prejudice.

Tennessee Rule of Evidence 615 is the rule of sequestration and is "colloquially referred to as 'The Rule.'" Neil P. Cohen et al., Tennessee Law of Evidence, § 6.15[2] (6th ed. 2011). Rule 615 provides

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded

witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness

The purpose of the rule of sequestration is to "prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992). The rule may be invoked at any time and is mandatory upon its invocation. See State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

Prior to the enactment of Tennessee Rule of Evidence 615 in 1991, our supreme court had explained the following regarding the rule of sequestration:

The attorney for the State has the right to such assistance as the prosecutor can give him in the management of the State's case, and, upon his request, it is not error to permit the prosecutor to remain in the courtroom after the rule has been called for; but the court should impose as a condition that the State, if it desires to use the prosecutor as a witness, should examine him first. The action of the court in the present case in declining to pursue this course was error, but, inasmuch as we cannot see that any substantial injury was done to the defense of the plaintiffs in error in the court below by such action, it cannot be treated as reversible error in the present case.

Smartt v. State, 80 S.W. 586, 588 (Tenn. 1903). In Mothershed v. State, 578 S.W.2d 96, 100-01 (Tenn. 1978), the court, citing Smartt, reiterated that a police officer testifying as the State's prosecuting witness is not subject to the rule but must testify first. More recently, this court explained,

"Smartt was decided when a testifying defendant was statutorily required to be the first witness for the defense. See Clemons v. State, 92 Tenn. 282, 21 S.W. 525 (1893). The rule in Smartt created a symmetry by preventing either party from having the

-9-

advantage of a witness being able to conform his testimony with that of other witnesses. See Brooks v. State, 406 U.S. 605, 611, 92 S. Ct. 1891. That symmetry was ended in Brooks when the United States Supreme Court held that making the defendant testify first or not at all violated the defendant's right against self-incrimination and right to due process. Id. 406 U.S. at 611 n.5.

Although the defendant no longer need testify first, we believe the Smartt rule generally remains in effect as shown in Mothershed."

State v. Stephens, 264 S.W.3d 719, 738-39 (Tenn. Crim. App. 2007) (quoting State v. Timmy Reagan, No. M2002-01472-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 452, at *50-51 (Nashville, May 19, 2004)). "When a State's designated representative does not testify first, the Defendant is entitled to relief only if the Defendant can show prejudice as a result." State v. Reginald Fowler, No. E2009-00293-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 807, at *55 (Knoxville, Sept. 29, 2010) (citing Stephens, 264 S.W.3d at 739).

In the instant case, the State called for "the Rule" before opening statements. Thereafter, the State designated Officer Ben Jones as the prosecuting witness. As its first witness, the State called Sergeant Clouse. Defense counsel objected, arguing, "If Mr. Jones is going to be in the room then I would assert that he has to go first. I think the rules are pretty clear on that. The State's allowed to have the one officer here at the table with them, but I do believe that person has to go first. And I would object to the order of this calling." The prosecutor responded, "I think that's incorrect, Judge. I mean, I'm allowed a witness to sit at the table with me. I don't have to call him first." The trial court overruled the objection and allowed the State to proceed.

At the motion for new trial, the prosecutor conceded that "the State should have called the designated officer first. I think just doing the research, I think that's correct." The trial court acknowledged that it "miscalled it" by overruling the appellant's objection.

On appeal, the appellant contends that the trial court abused its discretion by allowing the State to violate the rule of sequestration. The State concedes the error. Next, we must determine the effect of the error, mainly whether the appellant was prejudiced by the error.

Regarding prejudice, defense counsel contended at the motion for new trial that due to the sequestration violation, he was "forced . . . to alter [his] trial strategy" and that he was unable to cross-examine Sergeant Clouse the way he had intended or else he would "tip [his]

hand to Officer Jones." Defense counsel explained that if Officer Jones had not been in the courtroom, he

> would have done exactly what I did to Officer Jones – nine pages of voir dire until he admitted that it was 30 seconds. That he, in fact – that he had lied or was he mistaken or whatever, Judge. I don't know the answer to that, but I know that on that tape, one of those, Officer Jones says he's dead on it; and yet, the police report said 36 seconds and it was filed just a couple of hours later or shortly thereafter. So I couldn't attack [Sergeant Clouse] on that issue because Officer Jones is sitting here.

Defense counsel asserted that Sergeant Clouse's "credibility was given a lot of weight by that jury. And I wasn't allowed to attack him on that issue."

Defense counsel stated:

> Had I challenged [Sergeant Clouse] and went through that voir dire, Officer Jones would have changed his testimony right off the bat and it would not have taken nine pages for him to get it out. So that is exactly my basis that he's talking about, that Officer Jones' testimony would have changed. Had I voir dired [Sergeant Clouse] first, Officer Jones would have simply got on the stand and I asked him the question, it was 30 seconds. He didn't do that. It took my nine pages of voir dire to get it out of him. And that's exactly my point.

The trial court responded:

> Well, I certainly understand your point of view and I respect the vigor on which you argue on behalf of your client. The fact is irrefutable, though, that the witness said it was 36 seconds. The video said it was 30 seconds. Ultimately, Jones acknowledged it was 30 seconds. The jury clearly had the testimony of [Sergeant Clouse] that it could juxtapose against the actual count on the video and draw a conclusion as to whether that should impair the credibility of [Sergeant Clouse]. You had the ability to argue as long and as hard as you wanted to to the jury, you can't believe what [Sergeant Clouse] said

-11-

because he sat right there and told you it was 36 seconds, and you and I and everybody else in this courtroom have looked at the video and we know it's exactly 30 seconds.

. . . .

What was my error? My error was allowing a representative of the State to sit at counsel table when that person was not being called to testify first. The issue is whether that error made a difference. What I'm suggesting to you is that you made your point, in spades, that [Sergeant Clouse] said it was 36 seconds. The video, without equivocation, said that the Romberg test resulted in a 30-second count by your client, Mr. Cooper. [Sergeant Clouse], therefore, either intentionally or negligently misrepresented something when he testified on the witness stand. That's not lost on anybody in this courtroom or at that trial. So while I was at error, I don't see how it prejudiced your client.

On appeal, the appellant contends that "it should be found that the testimony of Officer Jones was likely influenced by hearing the testimony of his colleague Sergeant Clouse. . . . The State asked Officer Jones to corroborate Sergeant Clouse's testimony and Officer Jones referred to what Sergeant Clouse described because he was able to listen to his testimony." The appellant insists that "[m]ost important for the defense was the planned impact of the videotape to impeach each officer individually in front of the jury regarding the purported thirty-six seconds that the officers believed the Appellant took to count thirty seconds as part of the [R]omberg test." The appellant contends that "the impact of impeaching both officers immediately after each was examined directly was eliminated and the effect of only showing that the lower ranking, less experienced Officer Jones was incorrect on that very important point greatly diminished the Appellant's case."

A leading treatise has suggested that in determining the proper sanction to be applied for a violation of Rule 615, a court should consider the following non-exclusive factors: (1) the harm caused by the violation; (2) the importance of the testimony by the witness who violated the rule; and (3) the party at fault for the violation. Neil P. Cohen et al. Tennessee Law of Evidence § 6.15[11][c] (LEXIS publishing, 6th ed. 2011). Regarding the first factor, a court should consider whether the witness heard proof that could affect his or her testimony or whether the witness was exposed to unrelated proof. Id.

-12-

In the instant case, only two witnesses testified; accordingly, their credibility was paramount. The significance of the witnesses' testimony was made clear to the jury by the State's opening statement, wherein the State urged the jury not to focus on the video, which in our view was at best inconclusive. Instead, the State asked the jury to focus on "the totality of everything that you hear today. Focus on the driving. Focus on what the [appellant] says. How he says it. What he does. Focus on these officers['] training and experience and what they saw first-hand." Moreover, during deliberations the jury asked to review the video of the stop, indicating that the appellant's performance on the field sobriety tests was a close question.

Further, because of the violation Officer Jones was allowed to hear the testimony of Sergeant Clouse, his senior officer, regarding the very same questions he would be asked. In fact, the State said that it did not need to question Officer Jones extensively regarding the field sobriety tests because Sergeant Clouse had already testified about the tests. Regarding the appellant's performance of the Romberg test, Officer Jones testified consistently with Sergeant Clouse concerning the time it took to complete the test. Officer Jones did not change his testimony until he was repeatedly confronted on cross-examination with the video recording of the tests, which reflected that on the night in question, he stated that the appellant was "dead on it" and had performed the test in the exact time allotted. The appellant's cross-examination was vital to challenging the credibility of the State's witnesses, and his defense was harmed by counsel having to make last minute changes to his trial strategy which diminished the effect of his cross-examination. Accordingly, we conclude that the harm was great.

Turning to the importance of the testimony, as we have noted, Officer Jones's testimony concerned the precise facts at issue at trial, namely indicators of the appellant's intoxication. Third, a court should consider whether the violation was intentional or accidental. For example, "[i]f counsel offering the witness knew that the witness was in the courtroom in violation of the sequestration order, more drastic sanctions . . . may be appropriate." Id. Unquestionably, Officer Jones's presence in the courtroom was due primarily to the State's incorrect argument regarding Rule 615. Based upon the foregoing, we are unable to conclude that the error was harmless. Therefore, the appellant is entitled to a new trial.

## B. Cross-Examination

As his next issue, the appellant asserts that the trial court erred by sustaining the State's objection to the appellant's request to have Sergeant Clouse perform the Romberg field sobriety test. The appellant contends that the trial court violated his Sixth Amendment right to confront witnesses by curtailing his cross-examination. In response, the State

maintains that the trial court's ruling was correct.

The record reflects that on direct examination, Sergeant Clouse demonstrated, without objection, the proper way to perform the one leg stand test. Additionally, Sergeant Clouse showed the jury what he meant when he said that the appellant "flar[ed]" his arms, "cant[ed]," and walked in a small circle with "Bozo feet" during the walk and turn test. On cross-examination, defense counsel asked Sergeant Clouse if performing the Romberg test in thirty-six seconds was "bad." Sergeant Clouse responded, "It's not 30 seconds." At that point, defense counsel asked Sergeant Clouse to close his eyes. The State objected to the relevance of the request, and Defense counsel responded, "Judge, I want to see if he can do it." The State argued that the officer's ability to perform the test correctly was not relevant to establish whether the appellant properly performed the test. Defense counsel countered, "Judge, it's relevant to whether anybody can do it." The trial court sustained the State's objection, stating, "The only issue is your client and whether he could comply with the instructions."

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); State v. Brown, 29 S.W.3d 427, 430-31 (Tenn. 2000). Denial of a defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). Further, a defendant's right to confront and cross-examine witnesses "does not mean that a defendant has a right to present irrelevant evidence." State v. Sheline, 955 S.W.2d 42, 47 (Tenn. 1997). We will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. Dishman, 915 S.W.2d at 463.

Generally, whether to allow a courtroom demonstration is a matter that rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. State v. Underwood, 669 S.W.2d 700, 704 (Tenn. Crim. App. 1984). This court has further instructed that "'[d]emonstrative evidence is admissible only if relevant under [Tenn. R. Evid.] 401.'" State v. Coulter, 67 S.W.3d 3, (Tenn. Crim. App. 2001) (quoting Ronald Bradford Waller v. State, No. E1999-02034-CCA-R3-PC, 2000 Tenn. Crim. App.

LEXIS 558, at *45 (Knoxville, July 18, 2000)). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible." The trial court has the discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

At the motion for new trial hearing, defense counsel argued that he wanted the jury to see whether Sergeant Clouse was capable of performing the Romberg test within the allotted time frame. In his brief, the appellant explained that he wanted to compare the appellant's performance with Sergeant Clouse's. The trial court observed that "what concerns me is that the officer is not on trial. [The appellant] was on trial. The officer may be a completely competent officer but have a club foot, could do a nine-step walk and turn if he had to. . . . You know, or it could be that he's a completely competent officer and he can't count to 30. . . . [I]t concerns me that in requiring law enforcement to demonstrate these tests, or take the tests at the request of defense counsel, that I am, in essence, putting the law enforcement officer on trial as opposed to the person accused of a crime." The trial court asserted that the issue was not whether Sergeant Clouse could perform the test but whether the appellant could perform the test. We agree with the trial court that Sergeant Clouse's ability to perform the test was not relevant to the appellant's ability to perform the test. Accordingly, we conclude that the trial court did not abuse its discretion by prohibiting the test.

## C. Sufficiency of the Evidence

Finally, the appellant argues that the evidence is not sufficient to sustain his DUI conviction. In response, the State asserts that the evidence is sufficient.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v.

Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Tennessee Code Annotated section 55-10-401(a)(1), the DUI statute, provides, in pertinent part, that "[i]t is unlawful for any person to drive or to be in physical control of any automobile or other motor vehicle on any of the public roads and highways of the state . . . or any other premises frequented by the public at large, while [u]nder the influence of any intoxicant[.]" The proof at trial revealed that the appellant was stopped after he was observed driving fifty-five miles per hour in a forty-mile-per-hour zone and failing to stop at a red light. After the officers stopped the appellant and approached his vehicle, they saw an open bottle of beer in the console. The bottle was cold and had condensation on the side. Sergeant Clouse asked the appellant if he had been drinking, and the appellant responded that he had consumed two beers. When the appellant exited his vehicle, both officers smelled alcohol on the appellant and saw that his eyes were bloodshot and watery. After arresting the appellant for DUI, Sergeant Clouse again questioned the appellant about his drinking. The appellant then admitted, "'Oh, okay, yeah, okay, whatever, all right. I had three beers instead of two, okay, I lied.'" The officers searched the vehicle and found a twelve-pack carton of cold beer that had five cans missing. The jury heard the officers' testimony, the extensive cross-examination, and viewed the video of the field sobriety tests before finding that the appellant was intoxicated. We conclude that the evidence is sufficient for a reasonable jury to conclude beyond a reasonable doubt that the appellant was guilty of DUI.

## III. Conclusion

In sum, we conclude that the evidence is sufficient to sustain the appellant's convictions and that the trial court did not err by failing to permit defense counsel to ask Sergeant Clouse to perform the Romberg test. However, the violation of the rule of witness sequestration was reversible error; accordingly, we reverse the appellant's conviction and remand for retrial.

_____
NORMA McGEE OGLE, JUDGE